Argued September 18; reversed October 22, 1946

# FRANGOS *v.* EDMUNDS ET AL.

(173 P. (2d) 596)

Walter L. Tooze, Judge.

*Nels Peterson,* of Portland (Green & Landye and Nels Peterson, of Portland, on the brief), for appellant.

582

*Wendell K. Phillips* and *James Arthur Powers,* of Portland (Veazie, Powers & Veazie, of Portland, for respondent D. O. Armstrong; Sheppard & Phillips, of Portland, for respondent W. J. Edmunds; on the brief), for respondents.

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, LUSK and BRAND, Justices.

BRAND, J.

The complaint alleges that on January 8, 1944, while riding as a paying passenger in the bus owned and operated by the defendant Edmunds, the plaintiff suffered injury under the following circumstances:

The Edmunds' bus in which the plaintiff was riding was immediately preceded by a motor vehicle operated by the defendant Armstrong. The Armstrong vehicle was stopped suddenly and without warning immediately in front of the Edmunds' bus, whereupon the Edmunds' bus collided with the rear end of the Armstrong vehicle causing the plaintiff to be thrown from the seat and injured.

The complaint alleges that the defendant Armstrong was negligent:

"1. In failing to give any signal or warning of his intent to stop said vehicle suddenly.

"2. In failing to give proper attention to traffic then and there existing so that said motor vehicle could have been slowed down accordingly, and would not have been compelled to have stopped suddenly and without warning."

It is alleged that the defendant Edmunds was negligent as follows:

"1. In failing to have said bus under such control as to keep the same at such a distance from the motor vehicle immediately in front of him so as to prevent a collision.

"2. In failing to use his senses and faculties in the observance of the condition of the traffic immediately preceding him and in time to avoid collision with the motor vehicle operated by said defendant, D. O. Armstrong.

"3. In failing to bring said motor vehicle to a complete stop before colliding with the motor vehicle operated by said defendant, D. O. Armstrong."

The answer of the defendant Edmunds denies any negligence on his part.

By his amended answer, Armstrong denies negligence on his part and affirmatively alleges that as to him the accident was unavoidable and that, if the plaintiff was injured, it was the result of the sole negligence of the defendant Edmunds. The purported affirmative matter is denied by a reply.

By his first assignment of error, the plaintiff asserts that the court erred in sustaining a motion of the defendant Edmunds to strike a part of the original answer of the defendant Armstrong. The portion of the answer stricken reads as follows:

" * * * that this answering defendant sustained some damage to the equipment in the rear of his said bus and made claim therefore against

co-defendant, W. J. Edmunds, and admission of liability was made by, for and on behalf of said co-defendant, W. J. Edmunds, of liability for the accident, and payment to this answering defendant on account of the damage sustained was paid by, for and on behalf of said co-defendant, W. J. Edmunds."

The portion stricken was merely a pleading of evidence in the nature of an admission against interest which, if admissible, could be proven without being pleaded. The contest upon the motion to strike was between the defendants only. Plaintiff made no objection to the order when made and raises the question for the first time on appeal. He was not prejudiced in any way by the ruling of the court, which possesses inherent power independently of statute to strike pleadings or portions thereof. 49 C. J., Pleadings §§ 974, 993. And see *Eastham v. Telegram Publishing Company*, 119 Or. 211, 214, 248 P. 851.

The second assignment of error relates to the ruling of the court relative to a mechanical signaling device on the Armstrong vehicle. The driver was called by the plaintiff as an adverse witness and testified that the car was an old school bus, that it was impossible to give a hand signal, and that the bus was equipped with a mechanical arm device which he did not use. Witness was asked whether the device had been approved by the Secretary of State (as required by O. C. L. A. § 115-335). Witness answered: "I don't know." Counsel for plaintiff then said:

"Your Honor, we ask the defendant Armstrong to produce evidence as to whether or not the mechanical device that was on the bus had been approved by the Secretary of State.

"The Court: Is there any charge of negligence based on that?

"Mr. Powers: None.

"Mr. Peterson: Your Honor, counsel for the defendant Armstrong in his opening statement said there was a mechanical device on the rear end of the bus—

"The Court: That is anticipating a defense. There is no charge of negligence in here based on any mechanical device or based on the use of it or lack of use of it. I think it is immaterial.

"Mr. Peterson: May we have an exception, your Honor, because we want to show that there is no mechanical device on that bus that has been approved by the Secretary of State, and that the witness has said that he could not signal by sticking his arm out, and I refer particularly to Section 115-335 of the Code."

There was no charge of negligence specifically based on the use or lack of use of a mechanical device, but there was a general charge of failure to give any signal which included any mechanical signal. Plaintiff was entitled to inquire concerning the use of any signal; but, in view of the fact that the undisputed evidence showed no signal was ever given by any mechanical arm device, the question as to whether the unused device had been approved by the Secretary of State was clearly immaterial. The court made no error nor improper comment on the evidence upon this issue.

■■ The third assignment. Dr. Nisbet, on the basis of his own examination of the plaintiff and the history of the case as given to him, testified that he had diagnosed the plaintiff's injury as a concussion of the brain, which he described as an injury to the brain substance resulting from a shakeup of the brain itself. He testified that as a rule the greatest injury to the brain is usually found adjacent to the external injury.

The plaintiff then inquired whether a blow of the kind described in the evidence could produce an injury to the brain at any point other than adjacent to the external laceration. To this question, objection was made; and the court ruled that it was speculative and the objection was sustained. Counsel then asked the witness: "Where did the injury to the brain occur?" We quote:

"The thing is this: In a concussion of the brain it is difficult to say definitely where the—the extent of the brain injury, because you have a shaking up of the brain cells, the structure of the brain. It has very definitely been shown that as a rule the greatest injury to the brain is closest to the site of the injury, but the way the brain is hung in the cavity it can be—

"Mr. Powers: Just a minute, if the Court please. He was asked where the brain injury to this man was. We have had a discussion here about what could have happened or that something else might have happened.

"The Court: Yes. Doctor, confine your answer to what you found here.

"Mr. Peterson: I think the doctor was trying to explain that, your Honor. He has to explain the structure of the brain before he can explain how there could be an injury to the brain.

"The Court: To a certain extent that is true, but he has now gone a little beyond that. You have said he had a concussion of the brain, and as I understood your answer it is very difficult to explain the spot where it might be."

We think that the questions propounded were proper and that the witness should have been permitted to complete his testimony as to the character and the effects of concussion for the enlightenment of the jury. The court's comment on the evidence was improper.

Considered alone, however, we think no reversible error was shown.

By his fourth assignment, the plaintiff complains of the conduct of the court in sustaining objection to a question propounded by counsel for the plaintiff and in commenting on the evidence in connection with his rule. We quote:

"Q (By Mr. Peterson) I will ask you this, Doctor: Why do you take spinal punctures?

"Mr. Phillips: He has already explained that, your Honor.

"The Court: He has explained that. He said they examine it to see whether syphillis is there, or if he has a brain injury, like a cracked skull, then if there is blood in there the blood will go down into the spinal fluid. I suppose if they find blood there that indicates there has been an injury up in the brain or there has been a tearing.

"A That is right.

"Mr. Peterson: And bleeding; is that correct, Doctor?

"A Yes.

"Mr. Phillips: Now just a moment. This is normal, so it doesn't make any difference, as I see it.

"The Court: The point is here that the doctor says that in this examination it was normal, so it doesn't make any difference what might happen in other cases. He didn't find anything in this spinal fluid, according to his testimony, so what might have happened is just all speculative. The objection will be sustained."

■■ The question being repetitious, there was no error in sustaining the objection. The comments of the court, however, were improper, especially where he stated what he supposed was indicated when blood is

found in the spinal fluid. O. C. L. A. § 5-308; *State v. Bunyard*, 73 Or. 222, 144 P. 449; *State v. Chee Gong*, 17 Or. 635, 21 P. 882.

■ We proceed to the fifth assignment. Dr. Raaf, an expert witness called by the plaintiff, had testified on direct examination that he diagnosed the plaintiff's ailment as a post traumatic cerebral syndrome. On cross-examination the doctor expressed the opinion that plaintiff did not have any brain damage. We quote:

"The Court: What is that? I don't just get that. Is there any relation between what they call hysteria and this term that you used, Doctor?

"A It grows into it.

"The Court: I mean post—

"A —traumatic cerebral syndrome. A post traumatic cerebral syndrome, as we already have said, is an indefinite term, and it is employed in those cases where you cannot see upon a neurological examination any evidence of brain damage."

The witness then continued with a long medical dissertation after which Mr. Powers, counsel for defendant Armstrong, said, "I believe that answers it pretty well, doesn't it, Judge?" and continued the examination. Again we quote:

"Q Then your recommendation at that time to Dr. Nisbet was that his case should be closed?

"Mr. Peterson: I object to that.

"Mr. Powers: I will ask him whether it was.

"Mr. Peterson: What are you asking him.

"Mr. Powers: I am going to ask him whether your recommendation then at that time, at the time that you made your report to Dr. Nisbet, was that the case—

"Mr. Peterson: No, I am going to object to that. The doctor may explain what his diagnosis was at that time.

"The Court: Yes. Let me see it so I will see what you are getting into.

"Mr. Powers: I can show you the part I am talking about, the very bottom part.

"The Court: Oh, this is all right.

"Mr. Powers: There is nothing objectionable about it that I want to ask him, his opinion on that.

"The Court: The relationship between physician and patient, between Dr. Nisbet and him, he thinks it ought to be closed. That is the case they are talking about, I assume."

The question was objectionable for two reasons. What Dr. Raaf recommended to Dr. Nisbet was hearsay. Furthermore, the recommendation that the "case should be closed" might well have misled the jury into the belief that it was the litigation which should be closed rather than the medical services. The court made no formal ruling upon the objection but in effect the objection was overruled because the court after examination gave his own interpretation of the doctor's memorandum which was not in evidence and himself answered counsel's question. The objection should have been sustained and the comment was improper.

■ The seventh assignment. In his direct examination, the plaintiff testified that after the accident he suffered pain in his eye with impairment of its use and that he had no control over the muscles in that area. He testified: "You know, well, it is paralyzed." The court struck the quoted statement concerning paralysis. The bill of exceptions shows that an exception was taken and allowed. Paralysis, in medical terminology, is defined by Webster as "abolition of function, whether complete or partial; esp., the loss of the power of voluntary motion, or of sensation, in any part of the body * * *." The statement of the witness which

was stricken was merely a short way of summarizing what he had already said, and there was no necessity for striking it.

There is no merit in the eighth assignment.

■ The ninth assignment. Counsel for the plaintiff asked the defendant Edmunds concerning his actions before he came to the amber light. Objection was made. We quote:

"Mr. Peterson: I want the witness to describe what happened immediately prior to the time of this accident.

"Mr. Phillips: That is not immediately prior to the accident. As I understand it, they went on through the red light when he motioned to go on, a hundred feet on down past the red light.

"Mr. Peterson: Not the red light; the amber light.

"Mr. Phillips: Or amber light.

"The Witness: Amber light.

"The Court: I don't know. I gathered from what the witness said, as I understand his testimony, that the cop there at the station, at the intersection, let a certain number of cars go through on the amber light, and then he switches it red and lets a bunch of the men cross the street. As soon as he does that, then he switches to amber again and then he lets a certain amount of traffic go on through, and then he switches it red again.

"The Witness: That is right.

"The Court: Now he testified that when the oil truck in the line of traffic that was ahead of him two or three cars came up to the intersection that it was flashed red and they all had to come to a stop clear back as far as the line went. Then they flashed it amber, and the oil truck starts up and all these cars start up, and he gets on through plus

some cars behind him. I don't know how many. Now that is the way I understood your testimony.

"The Witness: That is correct.

"Q (By Mr. Peterson) Then, Mr. Edmunds, when you were stopped, when the oil truck stopped at the red light, how close were you to the bus immediately in front of you?

"Mr. Phillips: I object to that on the ground it is incompetent, irrelevant and immaterial. It makes no difference in this lawsuit. There are no charges that we stopped back there behind the red light or that had anything to do with the accident.

"The Court: That would be too remote, anyway. The objection will be sustained."

Exception was taken and allowed to the ruling and to the statement of the court. The collision occurred after the cars had passed the light and had proceeded a hundred feet north of it. This assignment of error is without merit.

The tenth assignment is without merit.

■ By his eleventh assignment, the plaintiff takes exception to an inquiry and comment by the court. The defendant Edmunds was called as an adverse witness by the plaintiff. Counsel inquired of him concerning the condition of a cut over plaintiff's eye as it was immediately after the accident. The following transpired:

"Q Where was that cut over the eye?

"A I think it was just above his eyebrow, or right in there some place, his right eye.

"Q About how deep was it, as you observed?

"A Now I didn't pry into that. I don't know how deep it was.

"Q About how long was it, then?

"A Well, I couldn't tell you how long it was, even. It was smeared with blood.

"The Court: Is it material?

"Mr. Peterson: Yes, I think it is material.

"The Court: In what way?

"Mr. Peterson: He is the only person who can testify, as a matter of fact—

"The Court: There is no question about his getting the cut over his eye and it was sutured up.

"Mr. Phillips: With two stitches.

"The Court: Go ahead."

The extent of the cut was obviously material. By inquiring "Is it material?" and "In what way," the court by indirection commented adversely upon the plaintiff's case. The comment was improper.

 The thirteenth assignment. The plaintiff's wife was examined and upon inquiry described the condition of the plaintiff when he was in the hospital. She testified in substance that he was having terrific pains in the head, that he was nervous, very dizzy and unable to close his right eye. We quote:

"Q Did he complain about noise in his ear?

"A Yes.

"Mr. Powers: He has testified about that. What he complained about would not be testimony here at all. He has told the jury what his complaints were.

"The Court: His complaints to her are wholly immaterial; purely hearsay. A doctor can testify to complaints made because they are a part of the diagnosis. They are what are called subjective symptoms. He gets the subjective symptoms and makes an examination and sees what he can find objectively, and then in combination he makes his diagnosis. But what he may have said to his wife or to any third person is pure hearsay, all of it, and incompetent."

From the entire context it is apparent that the witness was testifying concerning complaints of present pain made by the plaintiff while in the hospital.

In *Weygandt v. Bartle,* 88 Or. 310, 171 P. 587, this court quoted with approval the following which has become settled law:

"All such declarations and exclamations of present pain or suffering as would ordinarily and probably be caused by such injury are admissible as original evidence when made under ordinary circumstances, although it be a considerable time after the injury; declarations of past pain and suffering or such declarations when made after the controversy has arisen or suit has been brought are not ordinarily admissible." 13 Cyc. 200 (8)

See also *Shaw v. Pacific Supply Cooperative,* 166 Or. 508, 113 P. (2d) 627; *Derrick v. Portland Eye, Ear, Nose & Throat Hospital,* 105 Or. 90, 209 P. 344; 4 Nichols, Applied Evidence, 3585 and notes.

Such complaints may be admissible even though not made to the physician as the basis for diagnosis. If the plaintiff's statements to his wife had been narratives of past pain or the like, they would have been inadmissible as hearsay. But there was nothing to justify the court's inferences that they were hearsay in this case, and the rule of law laid down by the court was patently incorrect. Under the statute, O. C. L. A. § 5-704, infra, an exception was imported. The statement of the court amounted to a general declaration that all the preceding testimony of the plaintiff's wife concerning his complaints of present distress, to most of which no objection had been made, was incompetent. The evidence of the defense was obviously directed at the conclusion that plaintiff's symptoms were imaginary, a theory which found support in the testimony of

Dr. Raaf. The blanket pronouncement of the court may well have influenced the jury in arriving at a verdict for defendants. The error was prejudicial.

Again, the plaintiff's wife was asked:

"Q Mrs. Frangos, was he able to hear?

"A Not like he used to.

"Q Was his hearing all right before this accident?

"Mr. Powers: That is something I don't see how—

"The Court: Yes, that is something that is purely subjective. She wouldn't know whether he could hear or not. He would be the only one who could testify to that. The objection will be sustained. The answer of the witness will be stricken and the jury is instructed to disregard it."

 The bill of exceptions certifies that an exception was taken and allowed. The plaintiff's wife was competent to testify whether her husband's hearing was "all right" before the accident. The court's pronouncement that the plaintiff's wife "wouldn't know whether he could hear or not" was an unwarranted comment on the evidence. However, no offer of proof was made, and the error appears to have been waived by the failure to make a specific assignment thereof in plaintiff's brief.

The fourteenth assignment. In response to a question of counsel, the plaintiff's wife also testified: "He still has headaches." We quote:

"Mr. Powers: That is something that only he would know, your Honor.

"The Court: Yes.

"Mr. Powers: Even the doctor doesn't know.

"The Court: That would be purely subjective.

The objection will be sustained, the answer will be stricken, and the jury is instructed to disregard it.''

The situation here is similar to that presented under the thirteenth assignment of error, except that it does not as clearly appear that the witness was testifying on the basis of complaints of present pain by the plaintiff.

The fifteenth assignment: In the original complaint it was alleged that plaintiff suffered a cut over his left eye. But to conform to the proof, he was permitted to amend his complaint by striking the word "left" and inserting the word "right." Counsel for the defendant Edmunds in his final argument repeatedly stated that Edmunds had denied the allegation concerning the cut over the left eye. Counsel for the plaintiff objected on the ground that the amendment had superseded the original complaint pro tanto and that the original complaint had not been introduced in evidence. The court was absent from the bench and no ruling was made.

The sixth and sixteenth assignments. The plaintiff complains of argument by counsel for the defendant Edmunds to the effect that Dr. Selling was not called as a witness because he was "out of town," there being no evidence to that effect. Counsel for the plaintiff objected, but the judge being absent from the court no ruling was had. The plaintiff had argued that the reason that the defendant Edmunds had not called Dr. Selling was that if he were called his testimony would corroborate the testimony of Dr. Oliver Nisbet, a witness for plaintiff. In reply, counsel for the defendant Edmunds stated that Dr. Selling was out of town, concerning which there was no evidence. The written report of Dr. Selling was in the hands

of both parties and his testimony was equally available to either plaintiff or defendants. We find no basis for an adverse inference against either plaintiff or defendants for failure to call the witness. Had the trial judge been in the courtroom, we assume that he would have sustained defendant's objection to plaintiff's argument and plaintiff's objection to defendant's statement.

The last two assignments bring into clear relief the twenty-first assignment to the effect that error was committed by the court in absenting himself from the bench and courtroom during the trial.

The bill of exceptions reads in part as follows:

"Exception No. XXI. That the Court was off the bench and absent from the courtroom during the progress of the trial of said cause, as shown in the affidavit filed by plaintiff in support of his motion for new trial, the affidavit filed by counsel for the respective defendants herein on July 17th, 1945, and the reply affidavit on behalf of plaintiff, heretofore filed in said cause on July 19th, 1945, by reference made a part hereof."

The certificate of the trial judge reads in part as follows:

" * * * I do further certify that the foregoing Bill of Exceptions is true and correct * * * and the exceptions to said rulings as set out in the Bill of Exceptions were taken at the time of said rulings, and were allowed by the Court, as stated in said Bill of Exceptions at the time said rulings were made * * *."

The following appears from the affidavits which were incorporated by reference in the bill of exceptions: At the conclusion of all of the evidence and at the beginning of the opening argument for the plain-

tiff, the court stated to counsel and to the jury that he had some requested instructions to study and stated that he would be off the bench and in his chambers during the course of argument. During the afternoon of May 28, 1945, the plaintiff completed his opening argument and counsel for the defendant Armstrong completed his argument to the jury, and the jury were excused until the following morning, May 29, 1945. In stating his proposal to absent himself, the trial judge said in the presence of the jury that he hoped that the attorneys would not consider it discourteous to them, to which they assented.

From the affidavit of counsel for the defendants, it appears that it was stipulated by all counsel that the judge might retire to his chambers on the afternoon of May 28, 1945, and that he did so, leaving the door open to the courtroom, "and was approximately fifteen feet from where the argument was being made and was within easy calling and hearing distance of counsel at all times during all of the argument." We take it that the place "where the argument was being made" refers to the courtroom, not to the place where counsel was standing and that the judge was approximately fifteen feet from the communicating door between chambers and courtroom.

From the reply affidavit of counsel for the plaintiff, also incorporated in the bill of exceptions, it appears that the trial of the cause was resumed at 9:45 a. m. on May 29th, that the attorney for defendant Edmunds began his argument without the judge being on the bench or in the courtroom, that the judge absented himself without explanation and was absent during the entire argument of counsel for defendant Edmunds, that the absence of the judge on May 29th

was without explanation and was not assented to by counsel for the plaintiff, and that the assent to the departure of the judge from the courtroom on May 28th was done of necessity by reason of the statement having been made by the court in the presence of the jury.

■ It is asserted that in certain counties of the state it is the general practice of the judge to retire to chambers during the argument. If such be the case, the practice should be discontinued.

"A strict regard for the proper performance of his duties precludes the presiding judge from absenting himself from the courtroom during the actual progress of a trial before him. There is no discretion abiding in him to disregard this plain duty. His actual personal presence is necessary to a duly constituted court, and his departure leaves, at most, a disorganized tribunal. It is error for him to absent himself from the trial room during the trial so that he does not have immediate supervision and control of the proceedings. Thus, where the result of the judge's absence was that he could not determine the effect of alleged misconduct of the plaintiff, nor state the facts relative thereto for an appellate court, his action was held to be error." Bowers, Judicial Discretion of Trial Courts § 242.

"It is the duty of the trial judge, in every instance when he finds it necessary to absent himself from the courtroom when the trial is in progress, to suspend all judicial proceedings until his return. Such absence of the judge necessarily invites misconduct of some kind on the part of attorneys, spectators or other persons, and gives the parties to the suit no chance whatever of protecting themselves against such misconduct or of preserving proper exceptions through rulings of the court that might be made on objections raised to such misconduct. This court has frequently declared the rule that the absence of a judge during the argument

or other active proceedings in a trial before a jury is to be regarded as fatal error in a civil case unless it shall appear to the reviewing court that the cause of the complaining party was not prejudiced by what occurred in the court during the judge's absence." *Loftus v. Chicago Rys. Co.*, 293 Ill. 475, 127 N. E. 654.

The reason for the rule requiring the continued attendance of the trial judge is well stated by the Wisconsin Supreme Court:

"Herein is the vice of the matter. The bill of exceptions is expected to tell the complete story of the trial, from start to finish, and to tell it with absolute correctness. When the trial judge is absent there is in reality no person or officer who can certify to this court as to what took place during that absence. This court is, and must always remain, in doubt as to the matter; no satisfactory conclusion can be reached from the affidavits of opposing counsel; and thus this period remains a hiatus in the case. The presiding judge of a trial court is charged with the duty of trying the case from the opening to the close, and he ought not to abdicate his functions even for half an hour. During such an absence grave errors or abuses of privilege may occur, and this court may be left to the conflicting affidavits of overzealous attorneys or parties in interest to determine what in fact took place. This court is not organized nor authorized to try such questions, and we do not propose to do so. It avails not to say that error must be affirmatively shown. This is true, but, where the trial court has disabled itself from informing us as to what occurred, how is error to be shown save by affidavit? We cannot but regard this long absence from the bench during an important part of the trial as an error which calls for a new trial." *Smith v. Sherwood*, 95 Wis. 558, 70 N. W. 682.

"The theory of our jury system is that a jury trial shall be presided over by a judge. That does

not mean that a judge is expected to preside through part of a trial but need not preside through all of it. The argument of counsel to a jury on the merits of the case is as much a part of the trial as the introduction of evidence. Where, in the heat of oral argument by counsel, statements are made which the judge does not hear, there arises a situation of great seriousness, and this is presented in three important aspects: First, the dignity of the court is impaired and thereby public respect for the administration of justice is diminished; second, it is most difficult, if not impossible, for the judge, upon being recalled to the courtroom, to be put in possession of facts which will enable him to visualize the situation as it actually developed in his absence; and third, the judge is not in position to certify to the court of review what took place in his absence." *Snodgrass v. Charleston Nugrape Co.*, 113 W. Va. 748, 169 S. E. 406.

See also *Horne v. Rogers*, 110 Ga. 362, 35 S. E. 715, 49 L. R. A. 176; *Dulaney v. Sebastian's Adm'r*, 239 Ky. 577, 39 S. W. (2d) 1000; *Ciccolini v. Vocafilm Corporation of America*, 227 N. Y. App. Div. 736, 236 N. Y. S. 577, Id., 253 N. Y. 588, 171 N. E. 794; *Berrafato v. Exner*, 194 Wis. 149, 216 N. W. 165.

The failure of the court reporter to record the arguments during the absence of the judge accentuates the error.

"It is the duty of the trial judge to remain in the courtroom throughout the whole of the trial while any part of the trial is proceeding. The presiding judge is an integral part of the trial court, and ought not to be absent for any period while the trial is proceeding. In this case it appears that not only the judge but the court reporter was absent, and neither the trial court nor this court ought to be left to conflicting affidavits of interested and partisan attorneys to determine what, in fact,

took place during such absence." *O'Connor v. Bonney*, 57 S. D. 134, 231 N. W. 521.

Defendants contend that no objection or exception to the absence of the judge was taken and that therefore the question is not before us. Subject to the provisions of Rule 2 of the Supreme Court and of O. C. L. A. § 5-704, it is a general principle of law that it is not error alone, but error legally objected to that constitutes ground for reversal. *Hesse v. Mittleman*, 145 Or. 421, 27 P. (2d) 1022; *Porter Construction Co. v. Berry*, 136 Or. 80, 298 P. 179; *Kelley v. Stout Lumber Co.*, 123 Or. 647, 263 P. 881; *McIntosh Livestock Co. v. Buffington*, 108 Or. 358, 217 P. 635; *Bailey v. Security Ins. Co.*, 100 Or. 163, 196 P. 252; *Marks v. First National Bank*, 84 Or. 601, 165 P. 673.

Plaintiff contends, however, that the rule as stated in the cited cases has since been modified by the 1941 amendment of O. C. L. A. § 5-704, and that it was unnecessary for plaintiff to object or except at the trial to the withdrawal of the trial judge. The statute as amended reads as follows:

> "No instruction given to a jury shall be subject to review upon appeal unless its error, if any, was pointed out to the judicial officer who gave it and unless a notation of an exception was made in the circuit court. It shall be unnecessary to take exception to any other ruling made in the circuit court. All adverse rulings except those contained in instructions given shall import an exception in favor of the party against whom the ruling was made. The statement of the exception, when settled and allowed, shall be signed by the judge and filed with the clerk and thereafter it shall be deemed and taken to be a part of the record of the cause." O. C. L. A. § 5-704.

■ In leaving the bench, the trial judge made no "ruling" within the meaning of the statute.

In *Williams v. Ragan,* 174 Or. 328, 143 P. (2d) 209, we said:

"We think that these changes have been adopted in the interest of a simplified practice, upon the assumption that when upon the trial a party has asked for a ruling, either by a request for an instruction, or by offering or objecting to evidence, or moving to strike evidence, or in any other way, and the ruling is adverse, his dissatisfaction is manifested to the trial judge without the use of the formula 'I except', and likewise the trial judge is sufficiently advised of such party's position upon the question in controversy." *Williams v. Ragan,* supra.

■ It is still the rule that if counsel would avail himself on appeal of an error of the trial court committed during the course of the trial, he must advise the trial judge of his position by some offer, objection, motion or other appropriate action, to the end that the trial court may, before it is too late, avoid or rectify the error.

■ However, in the instant case the fact that the official transcript of testimony shows no exception or objection does not solve the problem, for, as we have seen, the bill of exceptions certifies that an exception to the absence of the judge was taken and allowed and the bill of exceptions imports absolute verity.

■ It is established law that this court is bound by the certificate of the trial judge as to the statement of objections contained in the bill of exceptions even though a discrepancy may occur between the bill and the transcript of the official reporter. *Smith v. Pacific Northwest Public Service Co.,* 146 Or. 422, 29 P. (2d)

819; *Johnson v. Ladd,* 144 Or. 268, 14 P. (2d) 280, 24 P. (2d) 17; *Latourette v. Miller,* 67 Or. 141, 135 P. 327; *Allen v. Standard Box & Lumber Co.,* 53 Or. 10, 96 P. 1109, 97 P. 555, 98 P. 509.

The difficulty arises from the fact that the bill of exceptions was of necessity made up by the trial judge from hearsay. It certifies to an exception but incorporates conflicting affidavits in the certificate. By it we are advised that it was stipulated "that the court might retire to his chambers on the afternoon of May 28th" to consider the instructions. But we are also advised that the judge was absent on May 29th and plaintiff did not assent thereto. The situation aptly illustrates the serious difficulties which arise when the trial judge absents himself from the courtroom.

■ It may be that plaintiff waived error by failing to seek a suspension of the trial during the absence of the judge on May 29th or by failing to call the judge back to rule on the objection to the argument for the defendant Edmunds. *Rogers v. J. C. Penney Co.,* 127 Neb. 885, 257 N. W. 252; *Texas Power & Light Co. v. Central Texas Battery Co.* (Tex. Civ. App.), 256 S. W. 644. But counsel in the presence of the jury is placed in a difficult and embarrassing dilemma when he must decide whether to object to the conduct of the trial judge in leaving the bench or to acquiesce and thus waive the clear rights of his client. In leaving the courtroom for a substantial period of time error was committed. We should not be compelled to speculate as to what transpired in the progress of the trial. In the confused state of the present record we deem it proper to notice the error.

■ The seventeenth assignment is without merit. The defendant Edmunds was a contract carrier within

the meaning of O. C. L. A. § 115-502. The court properly instructed the jury that his duty was measured by the rule of reasonable care under all the circumstances. *Gornstein v. Priver,* 64 Cal. App. 249, 221 P. 396; 13 C. J. S., Carriers § 678, p. 1262.

The eighteenth assignment. The plaintiff excepted to the refusal of the court to give a requested instruction on the subject of damages. A portion thereof states the age of the plaintiff and continues:.

"You are instructed that plaintiff therefore, as of that time, under the standard mortality tables, would have a life expectancy of 19.49 years. If you find that the injuries of plaintiff, if any, are of a permanent nature, you are entitled to take into consideration plaintiff's age at the time of the happening of the accident and his life expectancy at that time."

■ Where there is substantial evidence of permanent injury, the standard mortality tables may become admissible at least if earning power is permanently impaired. *Georgia Ry. & Power Co. v. Simms,* 33 Ga. App. 535, 126 S. E. 850; *Atlanta, K. & N. Railway Co. v. Gardner,* 122 Ga. 82, 49 S. E. 818; *Penley v. Teague & Harlow Co.,* 126 Me. 583, 140 Atl. 374; 25 C. J. S., Damages § 81, p. 594.

■ But the requested instruction implies that the life expectancy of the plaintiff was *determined* by the mortality tables, whereas plaintiff's life expectancy, if material at all, was itself a question of fact to be determined by the jury from a consideration of the tables and all other relevant testimony such as age, sex, health, habits, physical condition of the plaintiff, and the nature of his employment, whether hazardous or not. *Donoghue v. Smith,* 114 Conn. 64, 157 Atl. 415; *City of Friend v. Ingersoll,* 39 Neb. 717, 58 N. W. 281; *Mc-*

*Caffrey v. Swartz,* 285 Pa. 561, 132 Atl. 810; 4 Jones, Commentaries on Evidence (2d Ed.) § 1743, p. 3197. The court did not err in denying the request.

The nineteenth assignment. The court gave the following instruction:

> "Now, I instruct you that a motor vehicle operator is required to observe traffic signals such as the blinker light referred to in the evidence, and also a vehicle operator is required to obey and follow a traffic officer's directions. And if you find from the evidence that the driver Brown, who was driving Armstrong's car, was following directions of the traffic officer in driving where he was in the line of traffic immediately before the accident, then in that event you would not be entitled to find against the defendant Armstrong in this case and in favor of the plaintiff, and you must find for the defendant Armstrong upon that particular issue. But of course, whether or not that situation exists is for the jury to determine from the evidence in this case."

The evidence discloses that the Armstrong car driven by witness Brown was immediately in front of the Edmunds' car in which plaintiff was riding. Both cars were proceeding in heavy traffic in a northerly direction on Front Street, a four lane highway. Opposite the Poole, McGonigle & Jennings' plant and in the middle of the street, there was a blinker light which was being operated by an officer who would alternately flash a red light to accommodate cross traffic and then an amber light as a signal for the north bound traffic to proceed. As the Armstrong and Edmunds' vehicles approached the blinker light, it was flashing amber and they followed his directions and proceeded through at a speed of about five miles an hour. No other or different directions were given. They

continued beyond the blinker light and the officer, a distance of one hundred feet, to the point of collision. After the driver passed the light, he was on his own.

In view of the fact that the driver did follow directions of the officer at the only point where directions were given, the jury may well have considered the court's instruction as equivalent to a peremptory ruling that the plaintiff could not recover against the defendant Armstrong. They would apply the court's instruction to the only evidence to which it could apply, namely, the officer's directions as the cars approached the blinker light. Furthermore, no directions were given at any time or place except by the light and the waving of an official hand. Compliance with such directions would not relieve any driver from the duty of exercising reasonable care in other respects.

■ The exception taken by the plaintiff was as follows:

"We object to the instruction of the Court that the presence of a policeman or traffic officer may be taken into consideration. Under the undisputed evidence in this case there was no traffic officer or policeman present at the time of this accident."

It is imperfect in form, but we think it sufficiently advised the court as to the instruction to which it referred and as to the nature of the objection. The instruction was prejudicial to the rights of the plaintiff.

The twentieth exception. The court instructed the jury as follows:

"Now, I instruct you that if you find from the evidence in this case that the defendant Edmunds, without any negligence or fault upon his part, found himself confronted by a sudden emergency which constituted an imminent and impending danger or peril due to the unexpected action of someone or something else, the fact that in attempting to escape

such imminent danger he did the wrong thing would not of itself make him guilty of negligence, unless his actions at such time and place were not those of an ordinarily prudent person so faced with a like emergency or peril. And what the court has said with reference to the defendant W. J. Edmunds applies with equal force to the defendant D. O. Armstrong.''

■ The exception which was taken is somewhat lacking in specificity; but, since the case must be remanded for a new trial, it is proper to take note of errors apparent on the record for the advisement of the trial court upon the second hearing. The rule of reasonable care under all of the circumstances applies even in emergencies, the emergency being one of the circumstances to be considered. *Kiddle v. Schnitzer,* 167 Or. 316, 114 P. (2d) 109, 117 P. (2d) 983; *Noble v. Sears,* 122 Or. 162, 257 P. 809.

■ The general rule is amplified rather than contradicted by the so-called emergency doctrine. When a driver finds himself confronted by an emergency constituting an imminent and impending danger and alternative means of escape from collision are presented so that it becomes a matter of judgment as to what course to follow, he will not be liable for a mistake in judgment if he acted with such care and prudence as a reasonable person would exercise in such an emergency. This is true even though the choice he makes is not such as a reasonable person with ample opportunity for deliberation would make. The rule is always subject to the limitation that a person cannot avail himself of the emergency doctrine if the emergency arose by reason of his own negligence. A review of our decisions will disclose that the emergency doctrine ordinarily applies only when the evidence discloses that alterna-

tive action is possible and that quick judgment is required. *Swingley v. M. F. Patterson Dental Supply Co.,* 168 Or. 60, 120 P. (2d) 968; *Hornby v. Wiper,* 155 Or. 203, 63 P. (2d) 204; *McDowell v. Hurner,* 142 Or. 611, 13 P. (2d) 600, 20 P. (2d) 395, 88 A. L. R. 578; *Davis v. Underdahl,* 140 Or. 242, 13 P. (2d) 362; *Hansen v. Bedell Co.,* 132 Or. 332, 285 P. 823; *Goebel v. Vaught,* 126 Or. 332, 269 P. 491; *Hansen v. Bedell Co.,* 126 Or. 155, 268 P. 1020; *Marshall v. Olson,* 102 Or. 502, 202 P. 736.

As said in *Scarpelli v. Portland Electric Power Co.,* 130 Or. 267, 278 P. 99, the doctrine applies "when there is insufficient time available for reflection, and a judicious choice between methods * * *." Where the court by its instructions applied the emergency doctrine to situations in which the emergency was caused by the negligence of the party invoking the doctrine, the instruction has been held erroneous. *Kiddle v. Schnitzer,* supra; *Dickson v. King,* 151 Or. 512, 49 P. (2d) 367.

■ ■ Under the authorities cited if an emergency arose due to the negligence of the defendant Edmunds, he could not avail himself of the doctrine. On the other hand, if an emergency arose but not through any negligence of his, the doctrine would still be inapplicable, because after it arose no alternative courses presented themselves for sudden choice. In the midst of four-lane traffic, he could not then turn or swerve. He did not do the "wrong thing" in the emergency. He did the only thing that could then be done: He put on the brakes. The instruction on emergency should not have been given.

In connection with seven of the assignments of error, the plaintiff complains that the court commented on the

evidence contrary to the provisions of O. C. L. A. § 5-308.

There are other instances of comment which should be avoided at a second trial, among them the following:

Two experts were called by the plaintiff, Dr. Nisbet and Dr. Raaf: The former testified that plaintiff's injuries were permanent, the latter that they were not but were in part at least imaginary. Dr. Raaf's testimony strongly favored the position of the defendants. Immediately after Dr. Raaf took the stand the following transpired:

"Mr. Powers: It has already been stipulated and the Court announced here that Dr. Raaf is a leading—

"The Court: I think everybody agrees and they could not make it any stronger, that Dr. Raaf is recognized as a brain specialist. At least, the Court is very definitely of the opinion that he is a highly skilled specialist. * * *

"The Court: Everybody is agreed to that, so you don't need to waste any time on this doctor's qualifications. You may take that stipulation that counsel have made about Dr. Raaf's qualifications, because he is considered a highly skilled brain specialist. He may have some technical name for his profession, but he is so considered by the profession at large. * * *

"The Court: —he is highly skilled. Ordinarily, a jury would like to know a doctor's background, but where counsel for the defendant admits that he is recognized as probably the best, or among the best if not the best brain specialist in the West, you can't qualify a man any stronger than that."

Such a eulogy by the court must have put the plaintiff at a serious disadvantage before the jury.

Again we quote from the examination of Dr. Raaf:

"Q (By Mr. Peterson) Doctor, what is psychoneurosis?

"Mr. Phillips: There is no claim for that.

"Mr. Peterson: I think the doctor can explain that.

"The Court: I am going to let him. I think the doctor explained it. That was brought out by a question the Court asked. I suppose the Court shouldn't have asked it, but I did. * * *

"The Court: He was talking about this term, and what he was describing is what I had heard described some time in my life as hysteria, and I just wondered, for my own information more than anybody else's, what the connection was between the two. Now that was brought out * * *."

 The function of a trial judge is not that of a mere moderator. He is "the governor of the trial for the purpose of assuring its proper conduct and the fair and impartial administration of justice between the parties to the litigation. The wide discretionary powers vested in him are to be exercised so that abuses of justice shall not be accomplished under forms of law." 53 Am. Jur., Trial § 74. He may, in the exercise of a sound discretion, control the examination of witnesses and may, when necessary in the furtherance of impartial justice, examine a witness, though he should not by the form, manner or extent of his questions indicate to the jury his opinion on the merits. 53 Am. Jur., Trial §§ 74 and 75. In this state, however, his functions are limited by statute and decision which prohibit judicial comments upon the evidence. O. C. L. A. § 5-308; *State v. High,* 151 Or. 685, 51 P. (2d) 1044; *Keen v. Keen,* 49 Or. 362, 90 P. 147, 10 L. R. A. (N. S.) 504, 14 Ann. Cas. 45. Although unauthorized comments do not always constitute reversible error, they are not to be condoned.

■ The prejudicial effect of frequent comments on the evidence cannot be wholly removed by a final instruction to the jury to disregard what the court has previously said.

■ One other error should be noted. The court instructed the jury as follows:

"And as to the affirmative defense of the defendant D. O. Armstrong that the accident was unavoidable, and such as that, which has been denied, having made that affirmative allegation, so denied, upon the same he would carry the burden of proof."

This court recently held:

"In a case where no negligence is charged on the part of plaintiff leaving as the only issue that of alleged negligence on defendant's part, an instruction on unavoidable accident is merely a repetition of the charge that if no negligence has been proven on defendant's part proximately causing the accident the verdict of the jury should be for the defendant." *Murphy v. Read,* 157 Or. 487, 72 P. (2d) 935.

■ In *Kitchel v. Gallagher,* 126 Or. 373, 270 P. 488, we held that general instructions to the effect that plaintiff must prove the defendant negligent sufficiently covered the defense of unavoidable accident. Though affirmative in form, the pleading of unavoidable accident was not an affirmative defense, and the defendant does not have the burden of proving it. The instruction was unduly favorable to the plaintiff.

■ In determining the prejudicial effect of error, the court looks to the entire record. Upon a careful consideration of the record, we have concluded that the errors committed require that the judgment be reversed. The cause is remanded to the circuit court for new trial.